IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROCHELLE BRACY, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION |
| | : | |
| MELMARK INC. and REGINA MCGOWAN, | : | NO. 12-3323 |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OPINION

Tucker, C. J.                                                    September ___, 2013

Presently before the Court are cross motions for summary judgment: Plaintiff's Motion for Partial Summary Judgment (Doc. 19); Defendants' Response in Opposition (Doc. 22); Plaintiff's Reply (Doc. 29); Defendants' Motion for Summary Judgment (Doc. 18); Plaintiff's Response in Opposition (Doc. 20), Defendants' Reply (Doc. 23), and Plaintiff's Sur-Reply (Doc. 30).  Upon consideration of the parties' motions with briefs and exhibits, and for the reasons set forth below, Plaintiff's motion will be **denied** and Defendants' motion is will **granted in part and denied in part**.

## I.        FACTUAL BACKGROUND

Plaintiff Rochelle Bracy ("Plaintiff") worked for Defendant Melmark, Inc. ("Melmark") from January 3, 2011 to March 29, 2012 as a Health Services Manager in Melmark's Adult Program. Melmark is a comprehensive provider of residential, educational, therapeutic, and recreational services for children and adults with developmental disabilities.  During her tenure as a Health Services Manager, Plaintiff was supervised by Defendant Regina McGowan

1

("McGowan"), Director of Health Services, until Ms. McGowan's resignation from the company on March 19, 2012. After Ms. McGowan's resignation, Plaintiff was supervised by Loveinu Simmons ("Simmons"), Interim Director of Health Services, for the remainder of her employment with Melmark.

Plaintiff's father suffered from dementia. Beginning in October 2011, Plaintiff's father's dementia was advancing, which caused her to look into taking FMLA leave. At the time that Plaintiff began pursuing FMLA leave, she felt that her father was going to need more help getting to and from places; additionally, Plaintiff desired to help her father be more cooperative with her mother, who was his primary caretaker. Plaintiff was her father's primary caretaker in emergency situations. Plaintiff's father continued to worsen from October to December 2011, which precipitated Plaintiff's request to take leave on December 1, 2011 to care for her father's advanced dementia. Plaintiff provided Melmark with a form signed by her father's physician, which indicated Plaintiff's father suffered from advanced dementia, that Plaintiff needed to work on an intermittent basis, and that her leave needs would be "episodic." (hereinafter, "Health Care Provider Certification.") Plaintiff also completed Melmark's own FMLA Request Form, indicating that she was seeking "intermittent" time off to care for her father. Ms. McGowan informed Plaintiff, however, that she was not yet eligible to take FMLA leave because she had not been working for Melmark for at least one year. Under the FMLA, Plaintiff would not be eligible for FMLA leave until early January 2012.

On December 24, 2011, Plaintiff's father suffered a massive stroke and was hospitalized for approximately three weeks. Plaintiff's father was then transferred to Acadia Nursing and Rehab located in Dover, Delaware, where he remained until he passed away in the summer of 2012. After her father's stroke, Plaintiff took time off from work on December 26-30, 2011, and

January 2-3, 5-13, 2012, using holiday, sick leave, and "prescheduled late ins" approved by Ms. McGowan. These "prescheduled late ins," which were taken pursuant to Melmark's Employee Time Management Policy, permitted Plaintiff to work partial shifts.  Under Melmark's Employee Time Management Policy, these partial shifts were fully paid as if Plaintiff had worked full shifts, and did not count as lateness or absences.  Using these "late ins," Plaintiff was able to visit her father before she came into work.

Ultimately, Plaintiff was placed on FMLA leave on February 2, 2012.  The parties sharply dispute the circumstances surrounding Plaintiff taking FMLA leave.  Plaintiff states that on February 2, 2012, Ms. McGowan called her into her office and told her that her schedule was too erratic and that Melmark could no longer accommodate it.  Plaintiff alleges Ms. McGowan told her she could either take block FMLA leave or would be terminated that very day. Plaintiff then allegedly told Ms. McGowan that she did not need block leave, but Ms. McGowan again replied that Melmark could no longer accommodate Plaintiff.  Plaintiff states she then left Melmark that day with the understanding that she was still employed but that she had to take the block leave.

Conversely, Ms. McGowan avers that when Plaintiff arrived at work on February 2, 2012, she was emotionally incapable of working because of her father's ongoing health problems. According to Ms. McGowan, Plaintiff explained to her that she was unable to work any hours at all and wanted to resign from her position.  Ms. McGowan allegedly persuaded Plaintiff to take time off instead.

It appears that Ms. McGowan, under circumstances that remain in dispute, then communicated Plaintiff's need for leave to Kelly Herrmann ("Ms. Herrmann"), Melmark's Human Resources Manager.  Ms. Herrmann never had any follow-up discussion with Plaintiff

surrounding her need for FMLA leave. Ms. Herrmann only relied on statements made to her by Ms. McGowan in reviewing Plaintiff's request for leave.  Nevertheless, it was Ms. Herrmann that made the decision to grant Plaintiff's request for FMLA leave on February 2, 2012.  Ms. Herrmann did not contact Plaintiff to have her fill out a new FMLA Request Form. Ms. Herrmann instead relied on the previous Health Care Provider Certification and FMLA Request Form provided by Plaintiff in December 2011, because Ms. Herrmann felt that these were sufficient.  Both the Health Care Provider Certification and the FMLA Request Form that Ms. Herrmann relied upon clearly indicated that Plaintiff was requesting intermittent leave. Nonetheless, as of February 2, 2012, Plaintiff was placed on block leave that was scheduled to last until April 27, 2012.  In granting this leave, however, Melmark never received any documentation from Plaintiff indicating that she wanted or needed to take a block leave. Subsequently, on February 8, 2012, Ms. Herrmann sent Plaintiff a letter stating that she had been placed on a block leave under the FMLA from February 2, 2012 through April 27, 2012.

As a result of being placed on a block leave, Plaintiff was out of work from February 2, 2012 until March 26, 2012, when she opted to return to work early.  Shortly before Plaintiff returned to work, she learned that Ms. McGowan no longer worked at Melmark and that Ms. Simmons had replaced Ms. McGowan. About a week before Plaintiff returned to work, there was a conference call between Plaintiff, Ms. Herrmann, and Ms. Simmons to discuss Plaintiff's schedule upon her return.  Plaintiff stated during this call that she wanted her schedule changed and wanted to have the ability to work from home, if necessary. Ms. Herrmann and Ms. Simmons denied her request. During the conversation, after her schedule request had been denied, Plaintiff allegedly complained that she was being discriminated against because she is

African-American. Defendants deny that Plaintiff ever claimed she was being discriminated against.

Plaintiff returned to Melmark on March 26, 2012 on a full-time basis.  After Plaintiff had returned, she again had a conversation with Ms. Herrmann wherein she allegedly accused Melmark of denying her a schedule modification because of her race.  Plaintiff alleges that Kim Ford, a white employee who held a similar position to Plaintiff, had been permitted to have a modified schedule similar to that which Plaintiff was requesting. Plaintiff allegedly did not receive any response when she made her complaints about discrimination.  Ms. Herrmann denies that Plaintiff ever complained about race discrimination.

Plaintiff's employment with Melmark ended on March 29, 2012, under circumstances that remain in dispute.  According to Melmark, on March 28, 2012, Plaintiff emailed her then supervisor, Ms. Simmons, to request that she be permitted to take an extended lunch the following day for a medical appointment with her psychiatrist.  Ms. Simmons responded by stating that Melmark could not accommodate her request.  Melmark states it declined to grant Plaintiff an extended lunch to attend this appointment because of the short notice.  Plaintiff left work that day prior to receiving Ms. Simmons' response to her request.  Plaintiff testified that when she left she was under the impression that she was permitted to take an extended lunch.  Plaintiff did not become aware of the fact that her request had been denied until the following day, March 29, 2012.  Melmark contends that Plaintiff became upset upon reviewing Ms. Simmons' response, and then allegedly walked off the job after handing her keys over to Ms. Herrmann.

According to Plaintiff, she arrived at work on March 29, 2012 and went to speak with Ms. Herrmann about taking time off to go to her appointment.  Plaintiff claims Ms. Herrmann was

5

not in her office and so she returned to the nursing station to perform her job duties.  At

approximately 9:30 a.m., Plaintiff claims left her post to deliver some items to the "cottages" on

Melmark's campus, and also to take a break to have a cigarette.  Shortly thereafter, Plaintiff

received a call from her coworker, Sandra Fellman, informing her that she needed to take her

keys to Ms. Herrmann.  Plaintiff then proceeded to Ms. Herrmann's office and gave Ms.

Herrmann her keys. Ms. Herrmann allegedly told Plaintiff that she was "sorry it didn't work out."

In response, Plaintiff avers she stated that she did not know what Ms. Herrmann was talking

about and explicitly told Ms. Herrmann that she was not resigning her employment.  When Ms.

Herrmann allegedly did not respond, Plaintiff left Melmark and went home.

Plaintiff thereafter received a letter from Ms. Simmons stating that she had voluntarily

abandoned her position after she had turned her keys in to Ms. Herrmann and then left the

campus.  Based on her alleged conversation with Ms. Herrmann, however, Plaintiff understood

that she had been terminated.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed R. Civ P. 56(a); see also Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir.

2008).  A factual dispute between the parties will not defeat a motion for summary judgment

unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-

48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008).  A factual dispute is

genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under

the substantive law, it would affect the outcome of the suit. See Anderson, 477 U.S. at 248;

Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 327 (1986).  Once the moving party has carried its burden under Rule 56, "its' opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007).  Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007).  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. See Horsehead Indus., Inc. v. Paramount Communications, Inc., 258 F.3d 132 (3d Cir. 2001).  The court must award summary judgment on all claims unless the non-moving party shows through affidavits or admissible evidence that an issue of material fact remains. See, e.g., Love v. Rancocas Hosp., 270 F.Supp.2d 576, 579 (D.N.J. 2003); Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 330 (D.N.J. 2002).

### III.   DISCUSSION

Plaintiff now brings the following claims against the Defendants: (1) retaliation and interference in violation of the Family and Medical Leave Act ("FMLA") (Count I), and (2) discrimination, unequal pay, and retaliation in violation of 42 U.S.C. § 1981 (Count II).  Plaintiff has moved for summary judgment on her FMLA interference claim only.  Defendants have moved for summary judgment on all of Plaintiff's claims.

**A.  Plaintiff's Motion for Partial Summary Judgment**

The FMLA, *inter alia*, grants eligible employees the right to take up to twelve

workweeks of leave in any twelve-month period in order to care for the parent of the employee if

the parent has a serious health condition. 29 U.S.C. § 2612(a)(1)(C).  When employees invoke

rights protected by the FMLA, employers may not "interfere with, restrain, or deny the exercise

of or attempt to exercise" these rights. 29 U.S.C. § 2615(a)(1). Employers also cannot "discharge

or in any other manner discriminate against any individual for opposing any practice made

unlawful." 29 U.S.C. § 2615(a)(2). "The former provision is generally, if imperfectly, referred to

as 'interference' whereas the latter is often referred to as 'retaliation.'" Lichtenstein v. Univ. of

Pittsburgh Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012) (citing Callison v. City of Philadelphia,

430 F.3d 117, 119 (3d Cir.2005)).

1.  FMLA Interference

To prove an FMLA interference claim, an employee must show that she was entitled to

benefits under the FMLA and that her employer impermissibly denied her those benefits.

Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007) (internal citation

omitted); see also Callison, 430 F.3d at 119.  Further, an "employer cannot justify its actions by

establishing a legitimate business purpose for its decision" Callison, 430 F.3d at 119–120.  "An

interference action is not about discrimination, it is only about whether the employer provided

the employee with the entitlements guaranteed by the FMLA." Id., at 120.  An employee must

show prejudice from an employers' interference with her FMLA rights, however, to obtain relief

for such a claim. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 82 (2002).

It is undisputed that, by February 2012, Plaintiff was entitled to the benefits of the FMLA.[1]  Accordingly, the only issue the Court must determine is whether Defendants denied Plaintiff her entitlements under the FMLA.  Plaintiff argues that because Defendants "failed to properly advise of and implement [her] FMLA leave, they have committed an interference violation." (Pl. Mot. Partial Summ. J. 8.)  Specifically, Plaintiff argues she repeatedly requested that she be given intermittent leave, but was nonetheless placed on block leave in February 2012.  Accordingly, Plaintiff argues that Defendants failed to advise her that she was entitled to intermittent leave.  Relatedly, Plaintiff argues Defendants improperly implemented her FMLA leave by placing her on block leave even though the documentation she provided specified that she was seeking intermittent leave.

In response, Defendants first note that, pursuant to Melmark's Employee Time Management Policy, Ms. McGowan permitted Plaintiff to work paid partial shifts in December 2011 and January 2012.  Defendants contend that these paid partial shifts were, in essence, paid intermittent leave.  Defendants then argue that Plaintiff never requested intermittent leave in February 2011 and was granted block leave in full compliance with the FMLA.  In support of this contention, Defendants first claim that during her deposition Plaintiff testified that she did not want any leave at all in February 2012, let alone having requested intermittent leave.  Defendants then cite a number of reasons why Ms. McGowan's account of what transpired during her February 2, 2012 with Plaintiff is more "credible." (Defs.' Resp. Opp'n Pl.'s Mot. Partial Summ. J. 7.)

The Court finds there are genuine issues of material fact as to whether Defendants

---

[1] Defendants do not dispute that Plaintiff worked the requisite number of hours, or that it employed the requisite number of employees, or that her father's condition qualified as a serious health condition that entitled her to leave, or that Defendants had notice that Plaintiff intended to take an FMLA qualifying leave of absence.

interfered with Plaintiff's FMLA entitlement, thus precluding summary judgment in favor of either side.  It is irrefutable that the Health Care Provider Certification and FMLA Request Form Plaintiff submitted to Melmark in December 2011 both indicate that Plaintiff was seeking intermittent leave.  However, it is unclear whether and to what extent the February 2, 2012 conversation between Plaintiff and Ms. McGowan modified Plaintiff's original request for FMLA leave.  The content of the February 2, 2012 conversation is vitally material to the outcome of this case, and yet the parties disagree as to what was said during this conversation.

On the one hand, Plaintiff has cited evidence which suggests that she did not want to take block leave in February 2012, and instead wanted to be able to take FMLA intermittent leave — just as she had undeniably requested in December 2011.  For example, Plaintiff's coworker Ms. Fellman, who was responsible for the scheduling of nurses at Melmark, testified that she recalled Ms. McGowan telling Plaintiff that "it would be best if she took complete time off instead of coming and going." (Fellman Dep. 22:6-22:13.) This could potentially corroborate Plaintiff's contention that Ms. McGowan pressured her into taking block leave because Melmark no longer wanted to accommodate Plaintiff working partial shifts.  As Defendants argue, the partial shifts Plaintiff worked under Melmark's Employee Time Management Policy in December 2011 and January 2012 were, in effect, non-FMLA intermittent leave.  It is therefore conceivable that Melmark, after accommodating Plaintiff working partial shifts under the Employee Time Management Policy, may have been unwilling to accommodate Plaintiff taking additional intermittent leave under the FMLA.

Moreover, there is an obvious conflict between documentation Plaintiff provided in December 2011 (and relied upon by Ms. Herrmann in February 2012) and the type of leave Plaintiff was ultimately granted.  If, as Plaintiff claims, she requested intermittent leave in

10

February 2012 (just as she previously had back in December 2011), then it would have been improper for Melmark to place her on block leave — especially given that Melmark had no documentation to support Plaintiff's alleged request for block leave.  If, as Defendants claim, Plaintiff requested block leave from Ms. McGowan (who in turn communicated Plaintiff's alleged need for block leave to Ms. Herrmann), it is still unclear why Ms. Herrmann relied on the outdated and obviously contradictory documentation Plaintiff provided two months prior in granting Plaintiff's request.

On the other hand, Ms. McGowan's account of her February 2, 2012 conversation with Plaintiff is arguably corroborated by the deposition testimonies of Bernadette Toner, Plaintiff's coworker, and Rhoda Bracy, Plaintiff's mother. Ms. Toner testified that it was her understanding that Plaintiff wanted to take block leave. (Toner Dep 14:11-23.)  Toner further testified that, during a telephone conversation with Plaintiff one evening in February 2012, Plaintiff informed her she was going to take a vacation on "an island somewhere" and that Plaintiff's mother had "encouraged her to do [so] because she needed to get her head together and…take the time away." (Toner Dep. 14:24-15:19.)  In addition, Rhoda Bracy testified that when her daughter was applying for leave, Plaintiff informed her that she wanted to spend more time with her. (Rhoda Bracy Dep. 14:4-12.)  Thus, the testimonies of Ms. Toner and Rhoda Bracy would seem to suggest that Plaintiff wanted and therefore requested block leave because she needed more time off than her intermittent absences under Melmark's Employee Time Management Policy permitted.  The obvious interference is that Plaintiff may not have wanted to take intermittent FMLA leave because this too would have been insufficient.  It is therefore conceivable that Plaintiff could have requested block FMLA leave, even though Melmark did not observe the formality of having Plaintiff complete new forms.  Further, if Plaintiff had truly requested

intermittent leave on February 2, 2012, there remains the question of why she did not repudiate the grant of block FMLA leave once she received Ms. Herrmann's letter.

It is not province of this Court to determine whose account is more credible. See e.g., Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict."); Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir.2004) ("In considering a motion for summary judgment a district court may not make credibility determinations or engage in any weighing of the evidence….") (citing Anderson).  Accordingly, the Court denies both motions for summary judgment with respect to Plaintiff's FMLA interference claim.  The Court need not reach the other arguments advanced by the parties.

**B.  Defendants' Motion for Summary Judgment**

      1.  FMLA Retaliation

To prove an FMLA retaliation claim, Plaintiff must show that: (1) she invoked her right to FMLA benefits; (2) she suffered an adverse employment decision; and (3) the adverse decision was causally related to the invocation of her rights. See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004).  Courts analyze FMLA retaliation claims based on circumstantial evidence under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this scheme: (1) the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination; (2) the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if defendant meets its burden of production, the plaintiff must prove by a preponderance

of the evidence that defendant's proffered reason was a pretext for discrimination. McDonnell Douglas, 411 U.S. at 802.

a. Prima Facie Case

There is no dispute that Plaintiff took leave under the FMLA, thereby establishing the first element of a *prima facie* case. The question before the Court is whether Plaintiff can establish the second and third elements of a *prima facie* case. Plaintiff argues that she suffered an adverse employment action when she was allegedly terminated three days following her return from FMLA leave. Defendants, however, disavow any notion that Plaintiff was ever terminated and therefore suffered any adverse employment action. It is Defendants' position that Plaintiff quit her job voluntarily and was not a victim of discrimination.

The Court agrees with Defendants that Plaintiff cannot establish the second and third elements of a *prima facie* case. Plaintiff's briefs appear to assume that she was terminated, and therefore focus only on the causation element. The Court is unconvinced, however, that Plaintiff was terminated, and even less convinced that the events surrounding Plaintiff's separation from Melmark were causally related to her taking FMLA leave.

The record demonstrates that Plaintiff's explanation of what transpired on March 29, 2012 has been inconsistent. As previously stated, Plaintiff testified at her deposition that on the morning of March 29, 2012 she gathered some things from her office to take to the cottages on Melmark's campus and then went to take a cigarette break. (Rochelle Bracy Dep. 101:19-102:19.) It was while Plaintiff was allegedly outside smoking that she received an out of the blue voicemail from Ms. Fellman informing her that she needed to bring her keys to Ms. Herrmann. (Id. at 102:23-103:3.) Plaintiff then claimed that, when she went to Ms. Herrmann's office, Ms. Herrmann told her that she was "sorry it didn't work out." (Id. at 103:18-19.) In response,

13

Plaintiff allegedly stated that she did not know what Ms. Herrmann was talking about and explicitly told Ms. Herrmann that she was not resigning her employment.  (Id. at 103:19-21.) When Ms. Herrmann allegedly did not respond, Plaintiff left Melmark and went home. (Id. at 103:21-24.)  However, in her written submission to the Pennsylvania Unemployment Compensation Board of Review, Plaintiff stated that she went outside to smoke and cancel her appointment, and then received a voicemail from Ms. Fellman instructing her to drop of her keys. (Def.'s Ex. M at 4.)  At no point did Plaintiff represent to the Unemployment Compensation Board that she went outside to carry out her job functions by taking some items to the Melmark cottages.

The Unemployment Compensation Board ultimately denied Plaintiff's claim for benefits. Plaintiff filed an appeal which resulted in a hearing before a referee.  At the hearing, Plaintiff testified under oath that on March 29, 2012 she was outside smoking and calling to cancel her appointment when she received Ms. Fellman's voicemail telling her to turn in her keys. (Def.'s Ex. N at 5.)  Plaintiff further testified before the referee that that she did not ask Ms. Herrmann why she had been terminated because she "assumed it was part of the cleanout from the previous director." (Id.)  Plaintiff again made no mention of preparing to go out to the cottages.  Plaintiff also did not mention that Ms. Herrmann stated she was "sorry it didn't work out," although Plaintiff did testify that she told Ms. Herrmann "this was not [Plaintiff's] decision." (Id.) Further, Plaintiff's medical records for that day do not indicate that Plaintiff called to cancel her appointment; rather, Plaintiff's medical records indicate that she was a "no show." (Def.'s Ex. O.)

Conversely, three of Plaintiff's coworkers — Ellen Settar, Ms. Toner, and Ms. Fellman — all consistently testified that Plaintiff walked off the job on March 29, 2013.  Ms. Toner testified that Plaintiff came up to her and Ms. Fellman and asked them where she could find a

bag.  Plaintiff then left in search of a bag.  Plaintiff then came back to where Ms. Toner and Ms. Fellman were standing, wearing her coat and carrying a bag full of her belongings and her plant. Ms. Toner states that Plaintiff looked upset and said, "I'm done, I'm just [expletive] done, my mental health is more important than this job." (Toner Dep. 20:19-24:3.)  Ms. Toner then went to Plaintiff's office and found that all of Plaintiff's personal belongings were gone, including the pictures on the wall and all of Plaintiff's personal effects. (Id. at 24:4-25:10.)  Likewise, Ms. Settar testified that Plaintiff "came to the door of the nurse's station and had a variety of possessions in her arms and announced she was leaving." (Settar Dep. 17:18-18:6.)  Ms. Settar noticed Plaintiff had "pictures, a potted plant, some papers[,] and her personal pocketbook" with her. (Id. at 18:14-17.)  Ms. Settar also recalls that Plaintiff appeared angry, used profanity, and said something to the effect of "[t]his place was not good for her mental health." (Id. at 20:10-22:3.)  Similarly, Ms. Fellman testified that Plaintiff retrieved her plant and a bag, and walked out stating that she "was done" and "her health was more important than this job." (Fellman Dep. 36:3-36:16.)  Ms. Fellman then called Ms. Herrmann to report to that Plaintiff had walked out. Ms. Fellman testified that Ms. Herrmann told her to call Ms. Simmons on her cell phone.  Ms. Fellman did so, and Ms. Simmons agreed with Ms. Fellman that Plaintiff had abandoned her job. Ms. Simmons advised Ms. Fellman to inform Plaintiff to return her keys and her ID badge to HR. Ms. Fellman did so, leaving the aforementioned voicemail for Plaintiff. (Id. at 38:14-39:3.) Ms. Simmons' letter to Plaintiff, dated March 29, 2012, summarized these events as follows: "In essence, you walked off the job, essentially abandoning your job and voluntarily resigning without notice." (Def.'s Ex. L.)  Plaintiff never responded to Ms. Simmons' letter.

 The record evidence strongly suggests that Plaintiff, in apparent anger and frustration, quit her job voluntarily and was not the victim of discrimination.  The Court is here confronted

with a situation where Plaintiff's deposition testimony is inconsistent with her prior statements

regarding what transpired on March 29, 2012.  In particular, the Court finds it problematic that

Plaintiff did not mention in her prior statements that she was taking items out to the cottages

when she was abruptly "terminated." Plaintiff asserts this fact, apparently for the first time, in her

deposition testimony.  Plaintiff's contradictory deposition testimony is somewhat analogous to

"sham affidavit" cases, where a plaintiff introduces a contradictory affidavit subsequent to their

deposition testimony in an attempt to defeat a defendant's motion for summary judgment.  The

Third Circuit has remarked that "[w]hen, without a satisfactory explanation, a nonmovant's

affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in

determining whether a genuine issue of material fact exists." Hackerman v. Valley Fair, 932 F.2d

239, 241 (3d Cir.1991); see also Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806, 119

S. Ct. 1597, 1603, 143 L. Ed. 2d 966 (1999) ("A] party cannot create a genuine issue of fact

sufficient to survive summary judgment simply by contradicting his or her own previous sworn

statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn

deposition) without explaining the contradiction or attempting to resolve the disparity."); Martin

v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703 (3d Cir.1988); Starr v. Katz, CIV. A. 91-

3365, 1994 WL 548209 (D.N.J. Oct. 5, 1994) (The "testimony of the non-movant does not raise

an issue of fact when, without explanation, it contradicts his other statements in the record.")

Applying this reasoning to the instant matter, the Court finds that Plaintiff has failed to

explain why she omitted such a material fact from both her prior statement to and sworn

testimony before the Unemployment Board.  The Court can only assume that Plaintiff testified

(for the first time) during her deposition that she was taking certain items out to the cottages

because, otherwise, Plaintiff would have no explanation as to why she packed up her belongings

before she went outside on March 29, 2012.  But rather than offering some plausible explanation as to this apparent disparity between her prior statements and her deposition testimony, Plaintiff merely attempts to refute the testimony of her coworkers by arguing that it is inappropriate for the Court to make credibility determinations at the summary judgment stage. (Pl.'s Sur-Reply 1-2.) The Court makes no credibility determinations, however, in deciding that Plaintiff has not produced sufficient evidence to demonstrate that she was terminated.  Plaintiff's own version of the facts is inconsistent, and this inconsistency has been left unexplained.  Plaintiff cannot now create a genuine issue of material fact if she has offered no consistent version of what the facts are.

In addition, the Court further finds that even assuming *arguendo* that Plaintiff could establish that she was terminated, she would still be unable to prove that her termination was causally related to her invocation of her right to FMLA leave.  Courts consider "a broad array of evidence" in determining whether a sufficient causal link exists to survive a motion for summary judgment. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir.2000).  For instance, "[w]here the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' [this] is sufficient standing alone to create an inference of causality and defeat summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (citing Clark County School Dist. v. Breeden, 532 U.S. 268 (2001) and Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir.1989)).  In the instant matter, Plaintiff argues that her termination from Melmark a mere three days after returning from FMLA leave is "unusually suggestive" of retaliation.  However, courts do not look solely to timing in determining whether there is circumstantial evidence of a causal connection between the leave and the adverse action.  Rather, courts may ask whether "the proffered evidence, looked at as a whole, may suffice to

raise the inference" of retaliation.   LeBoon, 503 F.3d at 232 (citing Farrell, 206 F.3d at 280). "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." Id. at 232-33 (citing Farrell, 206 F.3d at 279-81).

Here the proffered evidence, as a whole, does not suggest Plaintiff was terminated for taking FMLA leave.  As has been discussed, three of Plaintiff's coworkers have consistently testified that Plaintiff walked off of the job on March 29, 2012.  Consistent with this, Melmark's articulated reason for terminating Plaintiff was that she abandoned her job on that day.  Melmark has never deviated in its explanation for Plaintiff's separation.

 Moreover, Plaintiff's conclusory assertion that she was treated less favorably than another, similarly situated employee is unavailing.  Specifically, Plaintiff has argued that, unlike a white employee named Kim Ford, she was denied the opportunity to work from home and/or work a reduced schedule after returning from her FMLA leave.  Plaintiff claims this disparate treatment is evidence of intervening antagonism or retaliatory animus directed toward her. Defendants, meanwhile, have outlined a number of reasons why Plaintiff and Ms. Ford were not similarly situated; for instance, Ms. Ford had worked at Melmark far longer and managed a greater number of clients than Plaintiff. (McGowan Dep. 19:18-20:14.)  Moreover, many of Ms. Ford's clients were located off campus in group homes, while Plaintiff's clients were all located on Melmark's campus. (Id.) Accordingly, Defendants' argue, it was logical for Ms. McGowan to permit Ms. Ford to work from home while preparing her reports at night after she had completed her visits to the group homes rather than requiring Ms. Ford to come to Melmark at the end of the day.  Plaintiff offers no evidence to rebut Defendants' arguments.

Additionally, the Court again notes that Defendants afforded Plaintiff time off from December 26-30, 2011 and January 2-3 and 5-13, 2012 using holiday, sick leave, and paid absences approved by Ms. McGowan under Melmark's Employee Time Management Policy. During this time period, Plaintiff was also permitted to work fully paid, partial shifts. Defendants were under no obligation to afford Plaintiff this benefit.  Further, Defendants afforded Plaintiff these benefits with the full knowledge that Plaintiff intended to reapply for FMLA leave once she became eligible to do so.  It simply defies logic to suggest that Melmark accommodated Plaintiff with a significant amount of paid time off and a partial shift schedule from December 26, 2011 to February 1, 2012, knowing that Plaintiff fully intended to take FMLA leave in the near future, only to then retaliate against Plaintiff for taking FMLA by firing her.

### b. Pretext

Even assuming Plaintiff could make out a *prima facie* case of FMLA retaliation, she would still have to establish that Melmark's legitimate, non-discriminatory reason for her separation is pretextual.  As the Third Circuit has explained:

> [T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (internal citations omitted).  Further, "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons…was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Id. (internal citations omitted)

(emphasis in original).  However, in rebutting the employer's proffered reason, the plaintiff

"cannot simply show that the employer's decision was wrong or mistaken, since the factual

dispute at issue is whether discriminatory animus motivated the employer, not whether the

employer is wise, shrewd, prudent, or competent." Id. at 765 (internal citations omitted). Rather,

"the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

a reasonable factfinder *could* rationally find them unworthy of credence…and hence infer that

the employer did not act for [the asserted] non-discriminatory reasons." Id. (internal quotations

omitted) (emphasis in original).

Plaintiff relies on the same evidence in arguing that Defendants' proffered reason for

"terminating" her is pretextual as she does for arguing the elements of a *prima facie* case have

been satisfied. Plaintiff contends:

> The fact that an employee that is told to turn their keys in to HR and then is told by an
> HR manager that he or she is sorry that it did not work out leads to a very reasonable
> inference that the employee was terminated. However, there can be no doubt that the
> employer then stating a letter stating the employee abandoned their position is so
> contradictory to what its own management knew at the time of termination, a reasonable
> jury could easily disbelieve Defendant[s'] articulated reason for a plaintiff's separation.

(Pl.'s Resp. Opp'n Def.'s Mot. Summ J. 28.)  The Court disagrees.  First, the Court notes that

Plaintiff testified for the first time at her deposition that Ms. Herrmann stated to her that she was

"sorry it didn't work out."  Plaintiff again made no mention of this seemingly material fact in her

prior statement to and sworn testimony before the Unemployment Board.  No reasonable jury

could infer that Plaintiff was terminated when Plaintiff herself omitted this material fact from her

prior accounts.  Further, there is no evidence that the letter Ms. Simmons sent to Plaintiff stating

Plaintiff had abandoned her position was "contradictory" to what management knew at the time.

Ms. Simmons' letter is fully consistent with the events of March 29, 2012 as relayed to her by

Ms. Fellman.  Secondly, Plaintiff herself testified before the referee that she did not ask Ms. Herrmann why she had been "terminated" because she "assumed it was part of the cleanout from the previous director." (Def.'s Ex. N at 5.)  Plaintiff's statement clearly indicates that Plaintiff attributed her alleged termination to a turnover in personnel after Ms. McGowan's resignation, not invidious discrimination or retaliation against hers for taking FMLA leave.

Accordingly, the Court finds that Plaintiff has not put forth sufficient evidence from which a reasonable jury could believe that Defendants' articulated reason for Plaintiff's separation is pretextual.

## 2. Section 1981

Finally, the Court addresses Plaintiff claims of discrimination, unequal pay, and retaliation brought under 42 U.S.C. § 1981.[2]  Plaintiff's § 1981 claim essentially mirrors her FMLA retaliation claim.  Specifically, Plaintiff argues that she complained of race discrimination to Ms. Herrmann and Ms. Simmons the week before she returned from FMLA leave, and as a result was terminated within three days after returning from FMLA leave. Plaintiff, an African American female, claims she was treated differently than a white female, Ms. Ford, in terms of pay and the ability to work from home and/or work a reduced schedule.  Defendants deny that Plaintiff made any complaints about discrimination based on race.

To satisfy a *prima facie* case for unlawful retaliation under § 1981, a plaintiff must show: (1) she engaged in protected activity; (2) her employer took an adverse employment action

---

[2] 42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (2012).

21

against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Moore v. City of Philadelphia, 461 F.3d 331, 340–41 (3d Cir.2006).[3]  Plaintiff's § 1981 retaliation claim, like her FMLA retaliation claim, is subject to the burden-shifting framework of McDonnel Douglas. Id. at 342; see also Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010).

Both sides rely on the same evidence and arguments for Plaintiff's § 1981 retaliation claim as they do for Plaintiff's FMLA retaliation claim. (See Pl.'s Resp. Opp'n Def.'s Mot. Summ J.30, Def.'s Reply Supp. Mot. Summ J. 19.)  Accordingly, for the reasons set forth above with respect to Plaintiff's FMLA retaliation claim, the Court finds that Plaintiff's § 1981 retaliation claim likewise fails.[4]  Plaintiff has presented no evidence which even begins to suggest that her separation from Melmark was due to her alleged complaints about racial discrimination.  Summary judgment is therefore entered in favor of the Defendants on this claim.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Partial Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted in part and denied in part.

---

[3] Although Moore is a Title VII retaliation case, the same standard applies in § 1981 retaliation cases. Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 803 (3d Cir. 2010) (citing Humphries v. CBOCS West, Inc., 474 F.3d 387, 403–04 (7th Cir.2007), aff'd, 553 U.S. 442, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008)).

[4] The Court also notes the following additional distinctions between Plainitff and Ms. Ford.  Plaintiff worked as a Health Services Manager in Melmark's Adult Program, while Ms. Ford worked as a Health Services Manager in Melmark's Children's Division.  Plaintiff was paid $16.16 per hour, while Ms. Ford was paid $22.18 per hour.  Defendants argue that this difference in pay can be explained by Ms. Ford's longevity with Melmark, as well as her education, experience, and job duties.  Ms. Ford had been working for Melmark since November 13, 2007; Plaintiff had only been working for Melmark for a little over a year.  Ms. Ford has an undergraduate degree and a teaching certificate for elementary education and special education.  Plaintiff has an associate's degree.  Moreover, prior to working for Melmark, Ms. Ford had worked as a medical supervisor for two years and as a substitute teacher.  By contrast, Plaintiff worked in various positions at social services agencies for four and one-half years; only three months of that experience was directly related to the provision of health services.  Finally, as previous discussed, Ms. Ford was permitted to work from home because the clients she serviced were off campus.

Defendants' motion is denied with respect to Plaintiff's FMLA interference claim, and granted with respect to Plaintiff's FMLA retaliation and § 1981 claims.

An appropriate order follows.